**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**WESTERN DIVISION AT CINCINNATI**

| | | |
|---|---|---|
| POLARIS HOME FUNDING CORP. | ) | |
| | ) | |
| Plaintiff, | ) | Case No: 1:25-cv-00385 |
| | ) | |
| vs. | ) | |
| | ) | |
| STEVE ELLIS, CHARLES "BO" KEARNEY, BRET SIBERT, and AMERICAN PACIFIC MORTGAGE CORPORATION | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S AMENDED COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES**

Plaintiff Polaris Home Funding Corp. ("Polaris"), by counsel, and for its Amended Complaint for Injunctive Relief and Damages against Defendants Steve Ellis, Charles "Bo" Kearney, Bret Sibert, and American Pacific Mortgage Corporation (collectively the "Defendants"), alleges and states as follows:

## NATURE OF THE ACTION

1. Polaris brings this action against Defendants, its former employees and their new employer, for breaches of the former employees legal and contractual duties to Polaris, including those under the employment agreements they entered into with Polaris.

## PARTIES

2. Polaris is a Florida corporation with its principal place of business in Grandville, Michigan.

3. Upon information and belief—and at all relevant times—Ellis, Kearney, and Sibert have been and currently are residents of southern Ohio.

4. American Pacific Mortgage Corporation is a corporation authorized to conduct business in Ohio with several offices in Ohio, including an office at 4000 Executive Park Drive, Suite 225, Cincinnati, OH 45241.

**JURISDICTION AND VENUE**

5. Paragraphs 1-4 are incorporated herein by reference as if fully restated herein.

6. Jurisdiction is proper in federal court pursuant to 28 U.S.C. § 1331 because Polaris alleges a federal claim against all Defendants under the Defend Trade Secrets Act, 18 U.S.C. § 1836.

7. Jurisdiction is also proper in this Court under 28 U.S.C. § 1332 because the parties are citizens of different states and the amount in controversy exceeds $75,000 per Defendant, exclusive of interest and costs.

8. Joinder of Defendants is proper under Rule 20(a)(2) of the Federal Rules of Civil Procedure because Polaris seeks relief against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences and there are questions of law or fact common to all Defendants.

9. The Court also has supplemental jurisdiction over Polaris' contractual and state law claims against all Defendants under 28 U.S.C. § 1367. *See Exxon Mobil Corp. v. Allapattah Services, Inc.*, 545 U.S. 546 (2005) ("Section 1367(a) is a broad grant of supplemental jurisdiction over other claims within the same case or controversy, as long as the action is one in which the district courts would have original jurisdiction. The last sentence of § 1367(a) makes it clear that the grant of supplemental jurisdiction extends to claims involving joinder … of additional parties.")

10. Venue is proper in this district pursuant to 28 U.S.C. § 1391 because Defendants reside in and a majority of the acts and omissions at issue happened in this Court's judicial district.

## FACTUAL BACKGROUND

***Polaris Home Funding Corp.***

11. Paragraphs 1-10 are incorporated herein by reference as if fully restated herein.

12. Polaris is in the business of providing homeowners and prospective home buyers with mortgage and refinance loan products.

13. Polaris invests significant time, effort, and resources into recruiting, training, and retaining its staff, including its sales team, managers, and loan officers.

14. Polaris relies on its customer base and realtor relationships for referrals. It is expected that if a customer or realtor is satisfied with its services, the customer or realtor will refer other potential customers to Polaris. Customers and realtor referrals are a crucial source of business for Polaris.

15. Polaris, and especially the branch at which Defendants—Ellis, Kearney, and Sibert—were employed, relies upon corporate marketing efforts (e.g., mailings) to generate business. Such marketing efforts, including mailings, can cost tens of thousands of dollars per month for a single branch.

16. Polaris has, through substantial time, effort, and resources, developed confidential, proprietary, and trade secret information relating to its provision of mortgage services, including but not limited to, customer and referral source information. Polaris maintains this information solely for its business purposes, and the information is not freely available to the public.

17. Polaris's sales staff, including branch managers, loan officers, and loan officer assistants, are the face of the company. These employees cultivate much of the goodwill that

Polaris has with its customers and referral sources through use of Polaris's resources and platforms. These employees are an integral part of developing and maintaining Polaris's goodwill and relationships with its customers and referral sources, which is critical to the success of Polaris's business.

18. Polaris takes reasonable measures to keep its confidential, proprietary, and trade secret information out of its competitors' hands. Polaris does so, for example, by taking physical and electronic security measures and requiring employees to sign employee agreements containing provisions, including certain restrictive covenants, intended to protect this information.

19. Polaris has a legitimate business interest in protecting its confidential, proprietary, and trade secret information as well as its goodwill with its customers and referral sources.

***American Pacific's business competes against Polaris***

20. American Pacific is in the business of providing homeowners and prospective home buyers with mortgage and refinance loan products in the retail residential home mortgage business. American Pacific is licensed and offers mortgage and/or loan products in Ohio.

21. American Pacific and Polaris compete against one another in Ohio to provide homeowners and prospective home buyers with residential home mortgages and refinance loan products.

***Polaris employees depart en masse to work for American Pacific.***

22. Polaris opened its West Chester, Ohio office in or around July 2022.

23. In or around July 2022, Polaris entered into employment agreements with each employee at its West Chester, Ohio office. A true and accurate list of employees who worked at Polaris' West Chester, Ohio office is attached as **Exhibit A**.

24. The sole reason Polaris opened the West Chester, Ohio office was to employ these employees, including Ellis, Kearney, and Sibert. *Id.*

25. Ellis and Kearney were the two loan officers in charge of the day-to-day operations of the West Chester, Ohio office.

26. In April 2025, every employee at Polaris' West Chester, Ohio office resigned from their employment with Polaris. *Id.*

27. Upon information and belief, every employee previously employed at Polaris' West Chester, Ohio branch now works for Polaris' competitor, American Pacific, in a capacity the same as or similar to their work for Polaris.

***Steve Ellis***

**A. Ellis' employment and contractual obligations to Polaris.**

28. Polaris hired Ellis on or about July 18, 2022.

29. In conjunction with Ellis' employment as a Loan Officer, he entered employment agreements with Polaris on or about July 18, 2022 (the "Ellis Agreement"). A true and accurate copy of the Ellis Agreement is attached as **Exhibit B**.

30. As a Loan Officer, Ellis' job duties included building a referral network through marketing and self-sourcing business to generate and originate loans, as well as managing a branch office, including the other loan officers assigned to it.

31. Ellis worked as part of a team, which he headed alongside Kearney.

32. Ellis' compensation was amended in May 2023 and became based on the following schedule:

> Loan Officer will be compensated in a commission format on a per closed & funded loan basis. Commission is based on the total loan amount. The Loan Officer will receive full commissions as outlined herein: The Loan Officer shall receive 1.75 % (0%-2.75%) of the total loan amount on Lender Paid Compensation transactions . .

> . . If Loan Officer receives a referral by the Branch Manager, the Loan Officer will receive a commission amount based upon one of the two following tiers: Referral 1) 1.00% of the total loan amount OR a set dollar amount of $N/A (minimum $500). OR Referral 2) a set dollar amount of $ 500.00 (minimum $500). Special circumstances where the house margin/dollar amount requested is below the minimum allowed must be approved by the President of Polaris.

*Id.* at 1.

33. A referral to a loan officer by the Branch Manager, also known as a house account, included referrals from mass mailings paid for by Polaris.

34. Ellis acquired confidential, proprietary, and trade secret information regarding, among other things, Polaris's customers and referral sources, as well as Polaris's sales and marketing strategies, lending practices, and risk tolerances.

35. Ellis was a trusted employee of Polaris, who was given access to the goodwill Polaris has developed with its customers and referral sources, as well as Polaris's confidential and trade secret information, including confidential information about Polaris's customers and referral sources.

36. As a trusted employee of Polaris, Ellis was given the responsibility of handling and dealing with checks, drafts, money orders, cashier's checks, or similar items on behalf of Polaris' West Chester, Ohio office. In exchange for this responsibility, Ellis signed an acknowledgment of the fiduciary responsibility he owed to Polaris. A true and accurate copy of Ellis' acknowledgment of fiduciary responsibility is attached as **Exhibit C**.

37. As a loan officer leading Polaris' West Chester, Ohio office, Ellis also had access to confidential information regarding the other loan officers in his branch and the customers they were serving or pursuing and the referral sources upon which they relied.

38. With respect to confidential information, Ellis agreed as follows:

> **CONFIDENTIALITY:** . . . Both during and after your employment with Polaris, you will forever hold in strictest confidence and not use or disclose any confidential

> information of the Company such as techniques, processes, developmental or experimental work, trade secrets, customer or prospect names or information, proprietary or confidential information relating to the current or planned products and services, sales information, or any other confidential information, except as such disclosure or use may be required In connection with your work for the Company.

*Id.* at 2.

39. Additionally, to protect Polaris' legitimate interests, Ellis agreed to the following non-solicitation of Polaris' customers and employees:

> **NON-SOLICITATION:** For a period of one year following the termination of this agreement, Loan Originator shall not, directly or indirectly, solicit the business of any of Polaris's customers. Furthermore, Loan Originator shall not, directly or indirectly, ask or encourage any employee of Polaris to leave their employment with Polaris, or otherwise solicit any Polaris employee for employment.

*Id.* at 2.

40. In order to persuade Polaris to invest large sums of money and open the branch office that Ellis was to lead, Ellis also agreed as follows:

> In this endeavor Polaris Home Funding will be required to outlay significant funding for branch opening and operations. Upon the opening of this office you will be required to remain an active originator for Polaris until $150 million in closed and funded loan volume has been achieved (Steve Ellis personal production ONLY, does not include any other originators) OR until all startup and unearned guarantees have been recovered by the Branch Operating Account, whichever comes first.

*Id.* at 5.

41. It was further agreed that "[a]fter considering all factors related to the running cost of this operation initial margins will be set pricing at 475bps on all programs." *Id.* And, "[s]pecial circumstances where the house margin/dollar amount requested is below the minimum allowed must be approved by the President of Polaris." *Id.* at 10.

42. Ellis also agreed that "Polaris is making a large investment in this new endeavor and it is critical that prior to lease consummation and any other spending occurs that [it] have a

formal commitment" and the "execution of [the Ellis Agreement] will serve as [Ellis'] commitment to Polaris." Finally, Ellis agreed as follows:

> If for any reason you choose to not proceed with this endeavor and Polaris becomes responsible for any spending, including but not limited to lease termination/buyout, actual cash cost of equipment purchased on your behalf etc you will be required to reimburse Polaris [].

*Id*. at 5-6.

43. As a result of Ellis' promises, Polaris agreed to "assume all of the upfront costs of opening this new branch location," but "[a]t the end of the first 90 days of production the branch operating account will be debited the amount of the Polaris initial outlay as all startup costs should have been defined by that date." *Id*. at 4.

44. The Ellis Agreement is a valid and enforceable contract between Polaris and Ellis.

45. Polaris fulfilled its material obligations under the Ellis Agreement.

46. Ellis owed and continues to owe legal and contractual obligations to Polaris pursuant to the Ellis Agreement.

**B. Ellis voluntarily resigns from Polaris to work at American Pacific**

47. Ellis voluntarily resigned from his employment with Polaris in or around April 2025.

48. At the time of his resignation, Ellis had not achieved $150 million in closed and funded loan volume, nor had all startup and unearned guarantees been recovered by the branch office he managed.

49. Ellis has not reimbursed Polaris for anything since his resignation.

50. Ellis now works for American Pacific, a direct competitor to Polaris in the same or similar capacity and in the same geographic area that he worked for Polaris, and doing so armed with Polaris' goodwill and knowledge of its confidential information.

***Charles "Bo" Kearney***

**A. Kearney's employment and contractual obligations to Polaris.**

51. Polaris hired Kearney on or about July 18, 2022.

52. In conjunction with Kearney's employment as a Loan Officer, he entered employment agreements with Polaris on or about July 18, 2022 (the "Kearney Agreement"). A true and accurate copy of the Kearney Agreement is attached as **Exhibit D**.

53. As a Loan Officer, Kearney's duties included building a referral network through marketing and self-sourcing business to generate and originate loans, as well as managing a branch office and the other loan officers assigned to it.

54. Kearney worked as part of a team, which he headed alongside Ellis.

55. Kearney's compensation was based on the following schedule:

> Loan Originator shall be compensated according to the following schedule. All commissions are based off the total loan amount of each closed loan. If the borrower came to the Loan Originator due to their personal database, efforts, Realtor or referral network, the Loan Officer shall be compensated 175bps (0-275bps, 1% of loan amount = 100bps) of the loan amount subject to a minimum dollar amount of $ N/A and a maximum dollar amount of $N/A. If Loan Officer receives a referral of a "house loan" by the Branch Manager, the Loan Officer will receive a commission amount of 1.00% (minimum of .50%) of the total loan amount . . . . Special circumstances where the house margin/dollar amount requested is below the minimum allowed must be approved by the President of Polaris.

*Id.* at 1.

56. As head of the West Chester, Ohio office, Kearney signed an addendum to the Kearney Agreement that also paid 10-bps of commission for every loan Ellis originated. A true and accurate copy of Kearney Commission Addendum is attached as **Exhibit E**. Kearney—as the Polaris employee in charge of payroll at the office—also had the ability to change the amount of commission he and Ellis would receive for loans originated.

57. Kearney acquired confidential, proprietary, and trade secret information regarding, among other things, Polaris's customers and referral sources, as well as Polaris's sales and marketing strategies, lending practices, and risk tolerances.

58. Kearney was a trusted employee of Polaris, who was given access to the goodwill Polaris has developed with its customers and referral sources, as well as Polaris's confidential and trade secret information, including confidential information about Polaris's customers and referral sources.

59. As a trusted employee of Polaris, Kearney was given the responsibility of handling and dealing with checks, drafts, money orders, cashier's checks, and was in charge of Polaris' West Chester, Ohio office payroll. In exchange for this responsibility, Kearney signed an acknowledgment of the fiduciary responsibility he owed to Polaris. A true and accurate copy of Ellis' acknowledgment of fiduciary responsibility is attached as **Exhibit F**.

60. As a loan officer leading Polaris' West Chester, Ohio office, Kearney also had access to confidential information regarding the other loan officers in his branch and the customers they were serving or pursuing and the referral sources upon which they relied.

61. With respect to confidential information, Kearney agreed as follows:

> **CONFIDENTIALITY:** As each Loan Originator has his or her own way of conducting business, Polaris tries to tailor a win - win with a each Loan Originator specifically. While the general terms of these offers are very similar, some uniqueness may be Incorporated and thus are considered confidential. If Loan Originator, at any point, allows these terms to become public knowledge, Polaris at its option, may render the offer null and void, or will renegotiate a new offer with Loan Originator. Both during and after your employment with Polaris, you will forever hold in strictest confidence and not use or disclose any confidential information of the Company such as techniques, processes, developmental or experimental work, trade secrets, customer or prospect names or information, proprietary or confidential information relating to the current or planned products and services, sales information, or any other confidential information, except as such disclosure or use may be required in connection with your work for the Company.

*Id.* at 2.

62. Additionally, to protect Polaris' legitimate interests, Kearney agreed to the following non-solicitation of Polaris' customers and employees:

> **NON-SOLICITATION:** For a period of one year following the termination of this agreement, Loan Originator shall not, directly or indirectly, solicit the business of any of Polaris's customers. Furthermore, Loan Originator shall not, directly or indirectly, ask or encourage any employee of Polaris to leave their employment with Polaris, or otherwise solicit any Polaris employee for employment.

*Id.* at 2.

63. In order to persuade Kearney to come work for Polaris, both also agreed as follows:

> In this endeavor Polaris Home Funding will be guaranteeing you 90 days of income in the amount of $21,836 per month. If in any month your earned income as elaborated in the prior paragraph were to exceed your guarantee you will be paid a "catch-up" payment equal to the amount equivalent to the amount not yet paid thru your guarantee. For this consideration, you agree to remain employed with Polaris until your personal production exceed $15 million in closed and funded volume. If you part ways with Polaris prior to achieving this threshold you will be subject to a pro-rata "clawback" of the guaranteed funds provided to you upon consummation of this new branch.

*Id*. at 6.

64. It was further agreed that "[a]fter considering all factors related to the running cost of this operation initial margins will be set pricing at 475bps on all programs." *Id.*

65. The Kearney Agreement is a valid and enforceable contract between Polaris and Kearney.

66. Polaris fulfilled its material obligations under the Kearney Agreement.

67. Kearney owed and continues to owe legal and contractual obligations to Polaris pursuant to the Kearney Agreement.

**C. Kearney voluntarily resigns from Polaris to work at American Pacific.**

68. Kearney voluntarily resigned from his employment with Polaris in or around April 2025.

69. At the time of his resignation, Kearney had not reached $15 million in closed or funded volume of loans prior to his resignation.

70. Kearney now works for American Pacific, a direct competitor to Polaris in the same or similar capacity and in the same geographic area that he worked for Polaris, and doing so armed with Polaris' confidential information.

***Bret Sibert***

**A. Sibert's employment and contractual obligations to Polaris.**

71. Polaris hired Sibert on or about July 18, 2022.

72. In conjunction with Sibert's employment as a Loan Officer Assistant, he entered employment agreements with Polaris on or about July 18, 2022 (the "Sibert Agreement"). A true and accurate copy of the Sibert Agreement is attached as **Exhibit G**.

73. As a Loan Officer Assistant, Sibert's job duties included working closely with Loan Officers to assist customers with application and loan documents.

74. Sibert, by working closely with Loan Officers, acquired Polaris' confidential, proprietary, and trade secret information regarding, among other things, Polaris's customers and referral sources, as well as Polaris's sales and marketing strategies, lending practices, and risk tolerances.

75. Sibert was a trusted employee of Polaris, who was given access to Polaris's confidential and trade secret information, including confidential information about Polaris's customers and referral sources.

76. As a Loan Officer Assistant, Sibert also had access to confidential information regarding the loan officers in his branch and the customers they were serving or pursuing and the referral sources upon which they relied.

77. With respect to this confidential information, Sibert agreed as follows:

> Both during and after your employment with Polaris, you will forever hold in strictest confidence and not use or disclose any confidential information of the Company such as techniques, processes, developmental or experimental work, trade secrets, customer or prospect names or information, pricing information, proprietary or confidential information relating to the current or planned products and services, sales information, or any other confidential information, except as such disclosure or use may be required in connection with your work for the Company.

*Id.* at 2.

78. The Sibert Agreement is a valid and enforceable contract between Polaris and Sibert.

79. Polaris fulfilled its material obligations under the Sibert Agreement.

80. Sibert owed and continues to owe legal and contractual obligations to Polaris pursuant to the Sibert Agreement.

**B. Sibert voluntarily resigns from Polaris to work at American Pacific.**

81. Sibert voluntarily resigned from his employment with Polaris in or around April 2025.

82. Sibert now works for American Pacific, and doing so armed with Polaris' confidential information.

***Polaris discovers substantial misconduct following the* en masse *departure***

**A. Ellis takes Higher Commissions than Permitted by Contract.**

83. In the mortgage industry, basis points or "bps" are a unit of measure equivalent to 0.01% (1/100th of a percent) or 0.0001 in decimal form.

84. The Ellis Agreement states that if he originated loans through leads provided by Polaris, he would only receive a 100-bps commission. If he originated loans through leads he

brought to Polaris, he would receive a 175-bps commission. And Kearney received 10-bps commission for every loan originated by Ellis.

85. Leads provided by Polaris are called "house loans," which boils down to customers that Polaris obtains through its marketing and mailing efforts. These customers are not generated by loan officers, but by Polaris through its own marketing efforts at its own considerable expense.

86. Ellis took advantage of these "house loan" opportunities and originated numerous loans throughout his employment at Polaris. These loans come with a 100-bps commission.

87. As head of the West Chester, Ohio office, Kearney had the ability to go into Polaris' system and change the commission Ellis received. Kearney would mark the amount of commission that Ellis was to receive and send it up to Shaunna Burkett, who handles payroll for Polaris. Burkett's function was largely ministerial and she did not independently confirm the veracity of what she was told by Ellis or Kearney – individuals who had both agreed in writing that they were fiduciaries of Polaris.

88. Polaris had previously caught Ellis claiming and accepting 175-bps commissions for loans originated through house loans. Kearney and Ellis stopped changing the commission percentage when Polaris brought it to Ellis' attention. Polaris and Burkett had no reason to question Kearney after Ellis stopped taking 175-bps loans or question what Kearney marked down. So Polaris would pay Ellis based on what Kearney said Ellis' commission should be.

89. Following the *en masse* departure of the West Chester, Ohio office, Polaris reviewed loans recently originated by Ellis. Again, Polaris discovered Kearney was approving Ellis to take 175-bps commissions on house loans originated through leads provided by Polaris.

90. Kearney knew Ellis should have only received 100-bps for those loans <u>because Kearney himself only took 100-bps for house loans originated through Polaris' marketing efforts</u>.

91. The overstated commission taken by Ellis—in breach of the Ellis Agreement— has resulted in lost profits to Polaris, in an amount far in excess of $75,000.

### B. As the Branch Manager, Kearney Inexplicably Adjusted Loan Terms Resulting in Virtually No Profit to Polaris But Inflated Commissions to Ellis and Kearney.

92. As the Branch Manager, Kearney had the ability to make reasonable adjustments in order to make a loan more competitive. Specifically, Kearney could make adjustments to the number of basis points that Polaris would receive as revenue.

93. Polaris has discovered numerous loans in which Kearney made adjustments resulting in virtually no profit or even a loss to Polaris. These adjustments were not reasonable.

94. It is believed that Kearney approved these loans so that he and Ellis could receive a full commission despite Polaris receiving no profit or even being harmed by the transaction.

95. Kearney earned 10-bps for every loan originated by Ellis. Thus, Kearney had every reason to approve unprofitable loans, so long as the loan closed.

96. To make matters worse, Kearney also routinely conspired with Ellis to approve a commission rate of 175-bps on house loans for which only a 100-bps commission was due to Ellis.

97. Essentially, Kearney made adjustments until loans were unprofitable while granting Ellis an inflated commission and taking 10-bps for himself.

### C. American Pacific conspired with Defendants to remove Polaris' Confidential Information

98. Polaris obtains confidential information related to customers through its marketing and mailing efforts and customers who refer potential customers to Polaris. For example, Polaris would pay money to have marketing information sent to thousands of individuals and, of those thousands, a few hundred would respond looking to utilize Polaris' business. And only individuals who receive the marketing information or who are referred by existing customers that reach out

and communicate with Polaris, who Polaris pulls credit information for, and who Polaris begins the loan process with are put into Polaris' system.

99. Coincidentally, Polaris' National Sales Manager Matt Moubray was at the West Chester, Ohio office the day before the mass exodus and returned to the office the day everyone resigned.

100. After the entire West Chester, Ohio office resigned, *en masse*, Polaris conducted a forensic review of Ellis and Sibert's Polaris network access.

101. Polaris' investigation revealed that, between March 1, 2025, and when the entire West Chester, Ohio office resigned, Sibert downloaded a substantial amount of information related to Polaris' customers.

102. Sibert, as a Loan Officer Assistant, would have no reason to download Polaris' confidential information—unless he was instructed to do so by the loan officer for whom he worked, Ellis.

103. Defendants—through briefing in this matter—admitted that each of them took Polaris' information from its customer relationship management ("CRM") system. (Resp. in Op., ECF No. 24, PageID # 340, 343; Ellis Decl., ECF No. 24-1, PageID # 355, ¶ 13.)

104. This course of conduct is not surprising or a coincidence as American Pacific has a transition team that works with incoming loan officers—like Defendants—to transfer their "pipelines." American Pacific describes its transition teams as follows:

> **Seamless onboarding and transitions:** <u>Our transitions team is here to help you and your team</u> onboard every step of the way so you can stick to what you do best: originating and closing loans. <u>This includes helping you transfer your</u> mortgage licenses and <u>pipeline</u>.[1]

(emphasis added).

[1] https://www.apmortgage.com/joinapm-blog/as-a-mortgage-loan-originator-who-you-work-for-matters.

105. Upon information and belief, American Pacific, Ellis, Kearney, and Sibert worked together to download and retain data from Polaris CRM (e.g., a current or prospective customer's loan information, income information, property information, financial information, etc.) to allow Ellis and Kearney to solicit Polaris' current and prospective customers on behalf of American Pacific. To the extent there is any publicly available information contained in Polaris' CRM, such information is intermingled with confidential information and constitutes a valuable compilation.

106. This breach of Ellis, Kearney, and Sibert's Agreements has caused, and will continue to cause, irreparable harm to Polaris' legitimate business interests, including its goodwill and confidential information, in an amount far in excess of $75,000.

107. American Pacific's inducement of Ellis, Kearney, and Sibert to breach their Agreements has caused, and will continue to cause, irreparable harm to Polaris' legitimate business interests, including its goodwill and confidential information, in an amount well over $75,000.

**D. Ellis Solicits Polaris' Customers.**

108. Ellis worked for Polaris for years, prior to his resignation in April 2025.

109. During that time, Ellis established relationships with Polaris' customers.

110. Following the *entire* West Chester, Ohio office resigning, Polaris had other Loan Officers in its employ reach out to customers that Ellis was servicing prior to his resignation.

111. One of Polaris' Loan Officers was told via text message by a customer that they had heard Ellis left Polaris and were going work with him.

112. Polaris has monitored Ellis' and Sibert's company emails and Sibert sent an email to an existing Polaris' customer—from Sibert's American Pacific email account—mistakenly copying Ellis' Polaris email account. The email notified Polaris' customer of Ellis working for American Pacific and offering their services to Polaris' customer.

113. Additionally, Polaris recently received an email from a customer that Polaris closed a loan for approximately one year ago. The customer had mistakenly sent an email to Sibert's old Polaris email. And the email Polaris' customer responded to had American Pacific's logo, and it was requesting updated information. There is absolutely no question that Defendants have solicited Polaris' customers on behalf of American Pacific.

114. Since the *en masse* departure, Polaris has had multiple customers request that their loan information be transferred to Ellis' new employer—American Pacific.

115. The solicitation by Ellis of Polaris' customers—in breach of the Ellis Agreement—has resulted in lost profits to Polaris and caused irreparable harm to Polaris' legitimate business interests, including the loss of its goodwill and reputation with its customers and confidential information, in an amount far in excess of $75,000.

***Polaris makes a good faith, but unsuccessful attempt to avoid litigation.***

116. On or about April 28, 2024, Polaris' counsel sent a letter to Ellis and Sibert in an attempt to get the pair to cease their multiple ongoing breaches of their respective agreements. A true and accurate copy of the letter is attached hereto, incorporated herein, and marked as **Exhibit H**.

117. Specifically, the letter requested certain assurances and explanations for Sibert and Ellis' actions. For example, the letter demands that Sibert and Ellis provide an assurance that they have deleted or destroyed Polaris' confidential information, and that Ellis and Sibert will no longer solicit Polaris' customers.

118. Ellis, a loan officer, and Sibert, a loan officer assistant, worked together to serve the same customers, and relied upon the same confidential information. They are now using Polaris' confidential information to serve American Pacific.

119. American Pacific's General Counsel Chuck Nugent sent a response letter on behalf of Defendants to Polaris. Notably, Nugent's letter agreed that, if Defendants Sibert downloaded Polaris' confidential information, such action was unlawful.

120. As discussed above, Polaris knows Sibert downloaded confidential information from its CRM and Defendants—through briefing in this matter—admitted that each of them took Polaris' information from its CRM system. (Resp. in Op., ECF No. 24, PageID # 340, 343; Ellis Decl., ECF No. 24-1, PageID # 355, ¶ 13.)

121. Ellis and Sibert's actions—in breach of their respective agreements— has resulted in lost profits to Polaris and caused irreparable harm to Polaris' legitimate business interests, including the loss of its goodwill and reputation with its customers and confidential information, in an amount far in excess of $75,000.

***Litigation is necessary to protect Polaris's legitimate interests and to recover the unearned portion of the Commissions.***

122. Polaris has been unsuccessful in its attempt to curb the damage caused by Defendants.

123. As Polaris' confidential customer information has been stolen and its customers are currently being solicited, Polaris determined it had no other option outside of filing this lawsuit.

## COUNT I: BREACH OF CONTRACTUAL DUTY OF CONFIDENTIALITY – ELLIS, KEARNEY, AND SIBERT

124. Paragraphs 1-123 are incorporated herein by reference as if fully stated herein.

125. Ellis, Kearney, and Sibert's respective agreements required them to refrain from using and disclosing Polaris's confidential and/or trade secret information to any third party—including American Pacific.

126. During briefing on Polaris' Motion for Preliminary Injunction, Polaris discovered—and Ellis, Kearney, and Sibert admitted—that each Defendant downloaded Polaris'

confidential information related to Polaris' customers, and numerous loan documents in violation of their Agreements. (Resp. in Op., ECF No. 24, PageID # 340, 343; Ellis Decl., ECF No. 24-1, PageID # 355, ¶ 13.)

127. On information and belief, Defendants continue to have access to Polaris' confidential information improperly taken from Polaris' servers.

128. On information and belief, Ellis, Kearney, and Sibert have and/or intend to use or disclose Polaris's confidential information to American Pacific to Polaris' detriment.

129. Specifically, prior to leaving Polaris, Ellis, Kearney, and Sibert improperly downloaded information related to customers.

130. Ellis, Kearney, and Sibert's actions breached their respective agreements' contractual confidentiality obligations to Polaris, wherein they agreed not to use or disclose Polaris' confidential information for any purpose other than on behalf of Polaris.

131. These breaches by Ellis, Kearney, and Sibert of their confidentiality obligations pursuant to their respective agreements has caused, and will continue to cause, injury, loss, and damage to Polaris and continuation of these breaches will result, unless restrained, in immediate and irreparable injury, loss, and damage to Polaris.

132. Polaris seeks damages for Ellis, Kearney, and Sibert's breaches of the confidentiality provision in an amount to be established at trial, an order requiring Ellis, Kearney, and Sibert to comply with the terms of the Agreement, and any other relief just and proper in the circumstances.

## COUNT II: TORTIOUS INTERFERENCE WITH BUSINESS RELATIONSHIPS – ALL DEFENDANTS

133. Paragraphs 1–132 are incorporated herein by reference as if fully restated herein.

134. Ellis, Kearney, and Sibert worked with Polaris' customers throughout their employment with the company. The Ellis and Kearney Agreements prohibit Ellis and Kearney from soliciting Polaris' customers for a period of one-year following their resignation.

135. Defendants knew that Ellis and Kearney were prohibited from soliciting Polaris' customers for a specified period.

136. Despite knowing about the prohibition, Ellis, Kearney, and Sibert willfully and deliberately stole Polaris' confidential information—which contained customer information—and reached out to Polaris' customers for the sole purpose of soliciting their business on behalf of American Pacific. (Resp. in Op., ECF No. 24, PageID # 340, 343; Ellis Decl., ECF No. 24-1, PageID # 355, ¶ 13.) American Pacific supported and encouraged Ellis, Kearney, and Sibert to perform these acts in breach of Ellis, Kearney, and Sibert's Agreements.

137. Defendants' intentionally and deliberately used the information Ellis, Kearney, and Sibert stole from Polaris to reach out to Polaris' customers to solicit them on behalf of American Pacific.

138. As a result of Defendants' actions, numerous customers have left Polaris and are instead doing business with Defendants.

139. Ellis and Kearney's direct or indirect solicitation of Polaris' customers, through their employment with American Pacific, has and will continue to cause Polaris irreparable injury, loss, and damages.

140. As a result of Defendants' tortious interference with business relationships, Polaris is entitled to the recovery of damages, its legal fees and costs, and all other relief deemed just and proper.

**COUNT III: BREACH OF CONTRACT,
NON-SOLICITATION OF CUSTOMERS – ELLIS**

141. Paragraphs 1–140 are incorporated herein by reference as if fully restated herein.

142. The Ellis Agreement prohibits Ellis from soliciting Polaris' customers for a period of one-year following his resignation.

143. Ellis' direct or indirect solicitation of Polaris' customers, through his employment with American Pacific, breaches his contractual obligations to Polaris as stated in each of their respective employee agreements with Polaris.

144. Ellis' breach of the Ellis Agreement's non-solicitation covenant has and will continue to cause Polaris irreparable injury, loss, and damage.

145. As a result of the Ellis' breach, Polaris is entitled to an injunction, the recovery of damages, and all other relief deemed just and proper.

**COUNT IV: CIVIL CONSPIRACY – ALL DEFENDANTS**

146. Paragraphs 1-145 are incorporated herein by reference as if fully restated herein.

147. Defendants knew Ellis, Kearney, and Sibert were prohibited from stealing Polaris' confidential information and using it for their own benefit, or the benefit of their new employer.

148. Defendants knew Ellis and Kearney were prohibited from soliciting Polaris' customers.

149. Despite this, Defendants conspired with one another to steal Polaris' confidential information and use it to contact and solicit Polaris' customers on behalf of American Pacific. (Resp. in Op., ECF No. 24, PageID # 340, 343; Ellis Decl., ECF No. 24-1, PageID # 355, ¶ 13.)

150. Ellis, Kearney, and Sibert intentionally and deliberately reached out to Polaris' customers to solicit them to work with them at American Pacific.

151. As a result of Defendants' actions, numerous Polaris' customers have stopped doing business with Polaris and are doing business with Defendants at American Pacific.

152. Defendants' direct or indirect solicitation of Polaris' customers, through their employment with American Pacific, has and will continue to cause Polaris irreparable injury, loss, and damages.

153. As a result of Defendants' tortious interference with business relationships, Polaris is entitled to the recovery of damages, its legal fees and costs, and all other relief deemed just and proper

**COUNT V: BREACH OF CONTRACT AS TO POLARIS' PAYMENT OF COMMISSION – ELLIS**

154. Paragraphs 1-153 are incorporated herein by reference as if fully restated herein.

155. Under the Ellis Agreement, if Ellis originated loans through leads provided by Polaris, he would only receive a 100-bps commission. But if he originated loans through leads he brought to Polaris, he would receive a 175-bps commission.

156. As head of the West Chester, Ohio office, Kearney had the ability to go into Polaris' system and change the commission Ellis received. Kearney would mark the amount of commission that Ellis was to receive and send it up to Shaunna Burkett, who handles payroll for Polaris.

157. Polaris had previously caught Ellis taking 175-bps commissions for loans originated through house loans. Kearney and Ellis stopped changing the commission percentage when Polaris brought it to Ellis' attention. Polaris and Burkett had no reason after Ellis stopped taking 175-bps loans and question what Kearney marked down. So Polaris would pay Ellis based on what Kearney said Ellis' commission should be.

158. Following the *en masse* departure of the West Chester, Ohio office, Polaris reviewed loans recently originated by Ellis.

159. Polaris discovered Ellis was taking 175-bps commissions for loans originated through leads provided by Polaris. Ellis should have only taken a 100-bps commission for originating these loans.

160. Polaris seeks damages for Ellis' breach of the Ellis Agreement's commission payment provision and any other relief just and proper in the circumstances.

**COUNT VI: BREACH OF CONTRACT AS TO POLARIS' PAYMENT OF COMMISSION – KEARNEY**

161. Paragraphs 1-160 are incorporated herein by reference as if fully restated herein.

162. Under the Kearney Agreement, if Kearney originated loans through leads provided by Polaris, he would only receive a 100-bps commission. But if he originated loans through leads he brought to Polaris, he would receive a 175-bps commission.

163. As head of the West Chester, Ohio office, Kearney had the ability to go into Polaris' system and change the commission he received. Kearney would mark the amount of commission that he was to receive and send it up to Shaunna Burkett, who handles payroll for Polaris.

164. Polaris and Burkett had no reason to question what Kearney marked down. So Polaris would pay Kearney based on what he said his commission should be.

165. Following the *en masse* departure of the West Chester, Ohio office, Polaris reviewed loans recently originated by Kearney.

166. Polaris discovered Kearney was taking 175-bps commissions for loans originated through leads provided by Polaris. Kearney should have only taken a 100-bps commission for originating these loans.

167. Polaris seeks damages for Kearney's breach of the Kearney Agreement's commission payment provision and any other relief just and proper in the circumstances.

## COUNT VII: BREACH OF CONTRACTUAL DUTY REGARDING POLARIS' PAYMENT OF COMMISSION – KEARNEY

168. Paragraphs 1-167 are incorporated herein by reference as if fully restated herein.

169. As head of the West Chester, Ohio office, Kearney had the ability to go into Polaris' system and change the commission he and Ellis received. Kearney would mark the amount of commission that he and Ellis were to receive and send it up to Shaunna Burkett, who handles payroll for Polaris.

170. Following the *en masse* departure of the West Chester, Ohio office, Polaris reviewed loans recently originated by Kearney and Ellis.

171. Polaris discovered Kearney was taking 10-bps commissions for loans originated through leads provided by Polaris. Polaris also discovered Ellis and Kearney were taking 175-bps commission for originating these loans. By inflating the commission on these loans, Polaris was lending to customers at or close to a loss. Effectively, the loans should not have been originated on the terms approved by Kearney and Ellis.

172. By Kearney approving a heightened commission rate on loans that should not have been closed and approving loan concessions beyond what was reasonable or customary, Polaris has suffered damages in an amount in excess of $75,000.

173. Polaris seeks damages for Kearney' breach of the Kearney Agreement's commission payment provision, and any other relief just and proper in the circumstances.

## COUNT VIII: BREACH OF CONTRACTUAL DUTY REGARDING POLARIS' PAYMENT OF COMMISSION – KEARNEY

174. Paragraphs 1-173 are incorporated herein by reference as if fully restated herein.

175. Under the Kearney Agreement, Kearney was to receive 10-bps for loans originated by Ellis.

176. As head of the West Chester, Ohio office, Kearney had the ability to go into Polaris' system and change the commission Ellis received. Kearney would mark the amount of commission that Ellis was to receive and send it up to Shaunna Burkett, who handles payroll for Polaris.

177. Polaris had previously caught Ellis taking 175-bps commissions for loans originated through house loans. Kearney and Ellis stopped changing the commission percentage when Polaris brought it to Ellis' attention. Polaris and Burkett had no reason after Ellis stopped taking 175-bps loans and question what Kearney marked down. So Polaris would pay Ellis based on what Kearney directed Ellis' commission should be.

178. Following the *en masse* departure of the West Chester, Ohio office, Polaris reviewed loans recently originated by Kearney.

179. Polaris discovered Kearney was taking 10-bps commissions for loans originated through leads provided by Polaris. And Ellis was taking 175-bps commission for originating these loans. By inflating the commission on these loans, Polaris was lending to customers at or close to a loss. Effectively, the loans should not have been originated on the terms approved by Kearney.

180. By Kearney approving a heightened commission rate on loans that should not have been closed and approving loan concessions beyond what was reasonable or customary, Polaris has suffered damages in an amount in excess of $75,000.

181. Polaris seeks damages for Kearney' breach of the Kearney Agreement's commission payment provision, and any other relief just and proper in the circumstances.

**COUNT IX: BREACH OF FIDUCIARY DUTY – ELLIS AND KEARNEY**

182. Paragraphs 1-181 are incorporated herein by reference as if fully restated herein.

183. Ellis and Kearney were given the responsibility of handling and dealing with checks, drafts, money orders, cashier's checks, or similar items on behalf of Polaris' West Chester, Ohio office. Kearney was also in charge of Polaris' payroll for the West Chester, Ohio office.

184. In exchange for this responsibility, Ellis and Kearney each signed an acknowledgment of the fiduciary responsibility they owed to Polaris.

185. As the head of the West Chester, Ohio office, Kearney had the ability to go into Polaris' system change the commission he and Ellis received.

186. Following the *en masse* departure of the West Chester, Ohio office, Polaris reviewed loans recently originated by Kearney and Ellis.

187. Polaris discovered Ellis was taking 175-bps commissions for loans originated from leads provided by Polaris. Ellis should have only taken a 100-bps commission for originating those loans. Under the Ellis Agreement, if Ellis originated loans through leads provided by Polaris, he would only receive a 100-bps commission. And if he originated loans through leads he brought to Polaris, he would receive a 175-bps commission.

188. Under the Kearney Agreement, if Ellis originated a loan, Kearney would get 10-bps commission.

189. Kearney and Ellis knew Kearney would be able to change the commission rate of loans they originated. And, as a result, Kearney and Ellis conspired to change Ellis' commission rate for loans he originated. Specifically, Polaris discovered Ellis was taking 175-bps commissions for loans originated through leads provided by Polaris. Ellis should have only taken a 100-bps commission for originating those loans. And Kearney received 10-bps commission for these loans.

190. Polaris seeks monetary and punitive damages for Ellis and Kearney's failure to uphold their fiduciary obligations, reasonable attorney's fees incurred in conjunction with the enforcement of the Agreement, and any other relief just and proper in the circumstances.

## COUNT X: CIVIL CONSPIRACY, THEFT OF POLARIS' PROFITS – ELLIS AND KEARNEY

191. Paragraphs 1-190 are incorporated herein by reference as if fully restated herein.

192. Kearney and Ellis knew they were only entitled to a 175-bps commission for loans originated through leads they developed and that they would only receive a 100-bps commission for leads brought to them by Polaris.

193. As head of the West Chester, Ohio office, Kearney had to the ability to change the commission he and Ellis would receive on loans originated.

194. Kearney and Ellis knew Kearney would be able to change the commission rate of loans they originated. And, as a result, Kearney and Ellis conspired to change Ellis' commission rate for loans he originated. Specifically, Polaris discovered Ellis was taking 175-bps commissions for loans originated through leads provided by Polaris. Ellis should have only taken a 100-bps commission for originating those loans. And Kearney received 10-bps commission for these loans, some of which meant Polaris took a loss on revenue due to the commission rate.

195. Kearney and Ellis' conspiring with one another has resulted in losses of hundreds of thousands of dollars from the theft of Polaris' profits.

196. Polaris seeks monetary and punitive damages for Kearney and Ellis' conspiracy to steal Polaris' profits, reasonable attorney's fees and costs, and any other relief just and proper in the circumstances.

**COUNT XI: FRAUDULENT MISREPRESENTATION – ELLIS AND KEARNEY**

197. Paragraphs 1-196 are incorporated herein by reference as if fully restated herein.

198. Under the Ellis Agreement, if Ellis originated loans through leads provided by Polaris, he would only receive a 100-bps commission. And if he originated loans through leads he brought to Polaris, he would receive a 175-bps commission.

199. Under the Kearney Agreement, if Ellis originated a loan, Kearney would get 10-bps commission. Kearney would approve loans that should have never been approved at a 175-bps rate, and Polaris took a loss on the loan as a result.

200. As head of the West Chester, Ohio office, Kearney had to the ability to change the commission he and Ellis would receive on loans originated.

201. Kearney and Ellis knew Kearney would be able to change the commission rate of loans they originated. And, as a result, Kearney and Ellis conspired to change Ellis' commission rate for loans he originated. Specifically, Polaris discovered Ellis was taking 175-bps commissions for loans originated through leads provided by Polaris. Ellis should have only taken a 100-bps commission for originating those loans. And Kearney received 10-bps commission for these loans, some of which meant Polaris took a loss on revenue due to the commission rate.

202. Kearney and Ellis misrepresented to Polaris, on the company's payroll, that Ellis was entitled to receive 175-bps commission for loans they originated from leads provided by Polaris.

203. Polaris paid Ellis 175-bps commission on loans when he should have only received 100-bps commission.

204. Kearney and Ellis' actions has resulted in loss of hundreds of thousands of dollars toward Polaris' profits.

205. Polaris seeks monetary and punitive damages for Kearney and Ellis' misrepresentation of their entitlement to commission, reasonable attorney's fees and costs, and any other just and proper relief in the circumstances.

**COUNT XII: UNJUST ENRICHMENT – ELLIS AND KEARNEY**

206. Paragraphs 1-205 are incorporated herein by reference as if fully restated herein.

207. Under the Ellis Agreement, if Ellis originated loans through leads provided by Polaris, he would only receive a 100-bps commission. And if he originated loans through leads he brought to Polaris, he would receive a 175-bps commission.

208. Under the Kearney Agreement, if Ellis originated a loan, Kearney would get 10-bps commission. Kearney would approve loans that should have never been approved at a 175-bps rate, and Polaris took a loss on the loan as a result.

209. Following the *en masse* departure of the West Chester, Ohio office, Polaris reviewed loans recently originated by Ellis and Kearney.

210. Polaris discovered Ellis and Kearney were taking 175-bps commissions for loans originated through leads provided by Polaris. Ellis and Kearney should have only taken a 100-bps commission for originating these loans.

211. Ellis has been unjustly enriched by Polaris' payment of 175-bps for loans that Ellis originated through leads provided by Polaris. And Kearney has been unjustly enriched by Polaris' payment of 10-bps for loans that should have never been approved at the 175-bps rate for Ellis.

212. Polaris has suffered financial harm by Ellis and Kearney's unjust enrichment.

213. Polaris seeks damages for Ellis and Kearney's failure to repay the unearned portion of the 175-bps Polaris paid to them, and any other relief just and proper in the circumstances.

## COUNT XIII: BREACH OF CONTRACT, RETENTION PERIOD OBLIGATIONS – ELLIS

214. Paragraphs 1–213 are incorporated herein by reference as if fully restated herein.

215. The Ellis Agreement contains a commitment from Ellis to remain employed until such time as he achieved $150 million in closed and funded loan volume or all startup and unearned guarantees were recovered by the branch office he managed.

216. Ellis voluntarily resigned his employment without achieving $150 million in closed and funded loan volume or securing the recovery of all startup and unearned guarantees by the branch office he managed.

217. The loans that Ellis did close and fund on behalf of Polaris were either unprofitable or minimally profitable because of the scheme to adjust Polaris' profitability downward while inflating his own commissions.

218. Because Ellis voluntarily resigned his employment without satisfying these minimum requirements, the Ellis Agreement provides that he must reimburse Polaris certain amounts.

219. As Ellis has not reimbursed Polaris any amounts, he is in breach of his retention period obligations.

220. As a result of the Ellis' breach, Polaris is entitled to the recovery of damages, and all other relief deemed just and proper.

**COUNT XIV: BREACH OF CONTRACT,**
**RETENTION PERIOD OBLIGATIONS – KEARNEY**

221. Paragraphs 1–220 are incorporated herein by reference as if fully restated herein.

222. The Kearney Agreement contains a commitment from Kearney to remain employed until such time as he achieved $15 million in closed and funded loan volume.

223. Kearney was paid a 90-day guarantee salary of $65,508 as an inducement to remain employed by Polaris.

224. Kearney voluntarily resigned his employment without achieving $15 million in closed and funded loan volume or securing the recovery of all startup and unearned guarantees by the branch office he managed.

225. Because Kearney voluntarily resigned his employment without satisfying these minimum requirements, the Kearney Agreement provides that he must reimburse Polaris certain amounts.

226. As Kearney has not reimbursed Polaris any amounts, he is in breach of his retention period obligations.

227. As a result of the Kearney' breach, Polaris is entitled to the recovery of damages, and all other relief deemed just and proper.

**COUNT XV: TORTIOUS INTERFERENCE WITH POLARIS' EMPLOYMENT CONTRACTS – AMERICAN PACIFIC**

228. Paragraphs 1–227 are incorporated herein by reference as if fully restated herein.

229. American Pacific knew Ellis, Kearney, and Sibert's Agreements prohibiting them from taking Polaris' confidential information.

230. American Pacific knew Ellis, Kearney, and Sibert's Agreements prohibited them from soliciting Polaris' current and prospective customers.

231. Despite knowledge of these contracts, American Pacific willfully and deliberately solicited Ellis and Kearney, and likely encouraged Ellis and/or Kearney to solicit Sibert and other employees, for the purpose of having them end their employment with Polaris and begin employment with American Pacific.

232. American Pacific encouraged or permitted Ellis, Kearney, and Sibert to misappropriate Polaris' confidential and trade secret information, in violation the Agreements, their fiduciary duties, and trade secret law.

233. American Pacific encouraged or permitted Ellis and Kearney to pursue business with Polaris' customers, in violation of those Defendants' Agreements with Polaris.

234. As a result of American Pacific's actions, numerous employees ended their employment relationships with Polaris after Ellis and Kearney solicited them to resign from Polaris and go work for American Pacific. Ellis and Kearney are also pursuing business with Polaris'

current and prospective customers while armed with Polaris' confidential information, in violation of those Defendants' Agreements with Polaris.

235. Ellis and/or Kearney's direct or indirect solicitation of Polaris' employees, on behalf of American Pacific, has and will continue to cause Polaris irreparable injury including damages stemming from lost profits as well as the harm to Polaris' goodwill, confidential information, and trade secrets, and all other relief deemed just and proper.

236. Ellis, Kearney, and Sibert's unlawful downloading of Polaris' confidential information has and will continue to cause Polaris irreparable injury including damages stemming from lost profits as well as the harm to Polaris' goodwill, confidential information, and trade secrets, and all other relief deemed just and proper.

237. Ellis and/or Kearney's direct or indirect solicitation of Polaris' current or prospective customers, on behalf of American Pacific, has and will continue to cause Polaris irreparable injury including damages stemming from lost profits as well as the harm to Polaris' goodwill, confidential information, and trade secrets, and all other relief deemed just and proper.

238. As a result of American Pacific's tortious interference with Polaris' contractual relationships with its employees, Polaris is entitled to the recovery of damages, including but not limited to compensatory damages, punitive damages, its legal fees and costs, and all other relief deemed just and proper.

**COUNT XVI: VIOLATION OF DEFEND TRADE SECRETS ACT, 18 U.S.C. § 1836 ET SEQ. – ALL DEFENDANTS**

239. Paragraphs 1–238 are incorporated herein by reference as if fully restated herein.

240. Polaris owns trade secret information that derives independent economic value, actual or potential, from not being generally known or ascertainable except through proper means.

241. Polaris takes and has taken reasonable measures to keep such information secret by, among other things, requiring employees to sign confidentiality agreements, password protecting its electronic resources, maintaining policies dictating strict information security, and training employees on the importance of information security.

242. Polaris' trade secrets are related to, among other things, Polaris' customers, prospective customers, and referral sources.

243. Under Ohio law, "[c]ustomer lists have been held to constitute trade secrets," provided that the list "contain[s] information not generally known to or readily ascertainable by the public." *Salemi v. Cleveland Metroparks*, 49 N.E.3d 1296, 1302 (Ohio 2016). This Court has looked to the standards imposed by Ohio law when considering whether information is a trade secret under the Defend Trade Secrets Act.

244. Defendants' misappropriation of Polaris' confidential information about customers and prospective customers and improper diversion of that confidential information to American Pacific has and will continue to cause injury to Polaris in, at a minimum, Ohio.

245. American Pacific competes with Polaris in Ohio.

246. Defendants have acquired, disclosed, and/or used Polaris' trade secrets, including customer information, via improper means and without Polaris' permission and has done so willfully. (Resp. in Op., ECF No. 24, PageID # 340, 343; Ellis Decl., ECF No. 24-1, PageID # 355, ¶ 13.)

247. Polaris has no adequate remedy at law to stop the damage Damages have caused and will continue to cause by their unlawful conduct.

248. Unless Defendants are enjoined, this misconduct will continue, and Polaris will continue to suffer losses, including the retention, disclosure, and impermissible use of its confidential information and trade secrets, and loss of customers, future revenue, and goodwill.

249. Polaris seeks monetary damages for Defendants' misappropriation of Polaris' confidential and trade secret information in an amount to be established at trial, an order enjoining Defendants from misappropriating Polaris' confidential and trade secret information any further, its reasonable attorneys' fees in bringing this lawsuit to protect its confidential and trade secret information, and any other relief just and proper in the circumstances.

**COUNT XVII: VIOLATION OF OHIO UNIFORM TRADE SECRETS ACT, OHIO REV. CODE § 1333.61 *et seq.* – ALL DEFENDANTS**

250. Paragraphs 1-249 are incorporated herein by reference as if fully restated herein.

251. Polaris owns trade secrets and confidential information that derive independent economic value, actual or potential, from not being generally known or ascertainable except through proper means.

252. Polaris takes and has taken reasonable measures to keep such information secret by, among other things, requiring employees to sign confidentiality agreements, password protecting its electronic resources, maintaining policies dictating strict information security, and training employees on the importance of information security.

253. Polaris' trade secrets are related to, among other things, customers, prospective customers, and referral sources.

254. Under Ohio law, "[c]ustomer lists have been held to constitute trade secrets," provided that the list "contain[s] information not generally known to or readily ascertainable by the public." *Salemi v. Cleveland Metroparks*, 49 N.E.3d 1296, 1302 (Ohio 2016).

255. Ellis, Kearney, and Sibert acquired Polaris' trade secrets and confidential information through their employment at Polaris.

256. American Pacific competes with Polaris in Ohio.

257. Defendants have improperly acquired, disclosed, and/or used Polaris' trade secrets, including customer information, without Polaris' permission, and they has done so willfully. (Resp. in Op., ECF No. 24, PageID # 340, 343; Ellis Decl., ECF No. 24-1, PageID # 355, ¶ 13.)

258. Polaris has no adequate remedy at law to stop the damage Defendants have caused and will continue to cause by their unlawful conduct.

259. Unless Defendants are enjoined, this misconduct will continue, and Polaris will continue to suffer losses, including the retention, disclosure, and impermissible use of its confidential information and trade secrets, and loss of customers, future revenue, and goodwill.

260. Polaris seeks monetary damages for Defendants' misappropriation of Polaris' confidential and trade secret information in an amount to be established at trial, an order enjoining Defendants from misappropriating Polaris' confidential and trade secret information any further, its reasonable attorneys' fees in bringing this lawsuit to protect its confidential and trade secret information, and any other relief just and proper in the circumstances.

## PRAYER FOR RELIEF

WHEREFORE, Polaris respectfully requests that the Court grant the following relief in its favor:

1. Issue a preliminary and then permanent injunction against the Defendants as well as all those in active concert or participation with them requiring specific performance of the terms and conditions of Ellis, Kearney, and Sibert's respective employee agreements and extend the

covenants therein for one-year from the date the Court issues any preliminary or permanent injunction under Ohio law. The requested injunction should conclude as follows:

a. As a direct and proximate result of the Ellis, Kearney, and Sibert's conduct, Polaris has suffered, and will continue to suffer, irreparable harm in the loss of business opportunities as well as harm to its goodwill and confidential information in an amount that cannot be fully, completely, and adequately remedied at law.

b. Ellis, Kearney, and Sibert have and continue to willfully violate their employee agreements, and American Pacific has and will continue to encourage them to violate their employee agreements, the federal Defend Trade Secrets Act, and Ohio's Uniform Trade Secrets Act through acts which include but are not limited to soliciting or accepting business from Polaris' customers and prospects, soliciting Polaris' employees, and using or disclosing Polaris' confidential, proprietary, or trade secret information.

c. Without injunctive relief against Ellis, Kearney, and Sibert as well as those in active concert or participation with them, they will continue to trade upon Polaris' goodwill and confidential information, thereby causing Polaris immediate and irreparable harm. In contrast, no harm will accrue to Defendants by entry of injunctive relief because they never had the right to violate their obligations in the first place.

d. Injunctive relief is appropriate because protection and maintenance of Polaris' goodwill and confidential, proprietary, and trade secret information is a vital and legitimate business concern. In the absence of injunctive relief, it is highly unlikely that Polaris will have the ability to precisely calculate the extent of the harm caused by Ellis, Kearney, and Sibert's actions.

e. In their employee agreements, Ellis, Kearney, and Sibert acknowledged and agreed that a remedy at law for any breach or threatened breach of the provisions of the agreement would be inadequate, thereby warranting issuance of injunctive relief.

f. The public interest will not be harmed if an injunction is granted.

g. Given Ellis, Kearney, and Sibert's willful and deliberate violations of their obligations, any bond required to be posted by Polaris should be *de minimis*.

h. The Court enjoins Ellis, Kearney, Sibert, American Pacific and those acting in concert with them from using and/or disclosing Polaris' confidential and trade secret information.

i. The Court enjoins Ellis and Kearney from, directly or indirectly, soliciting Polaris' employees until later of (1) the stated expiration date for their respective non-solicitation of employees provisions or (2) one year from the date the Court issues its preliminary or permanent injunction under the terms of the Agreements or Ohio law.

j. The Court enjoins Ellis and Kearney from, directly or indirectly, soliciting or accepting business from Polaris' current and/or prospective customers until later of (1) the stated expiration date for their respective non-solicitation of current and/or prospective customers provisions or (2) one year from the date the Court issues its preliminary or permanent injunction under the terms of the Agreements and Ohio law.

2. Enter judgment in favor of Polaris and against Ellis and Kearney for breaching their fiduciary duty and violating their employment agreements, and order them to repay Polaris the unearned portion of commissions they were paid by Polaris;

3. Enter judgment in favor of Polaris and against Ellis, Kearney, and Sibert for breaching the confidentiality provisions of their employment agreements, and order them to repay Polaris the unearned portion of the loan origination fees he was paid by Polaris;

4. Enter judgment in favor of Polaris and against Ellis and Kearney for breaching the nonsolicitation of customer provision of their employment agreements, and order them to repay Polaris' damages as a result of the unlawful solicitations;

5. Enter judgment in favor of Polaris and against Ellis and Kearney for breaching the nonsolicitation of employees provision of their employment agreements, and order them to repay Polaris' damages as a result of the unlawful solicitations;

6. Enter judgment in favor of Polaris and against Ellis and Kearney for breaching retention provision of their employment agreements, and order them to repay Polaris' damages as a result of their failure to hit the retention obligations;

7. Enter judgment in favor of Polaris and against Ellis, Kearney, Sibert, and American Pacific for Polaris' reasonable attorney's fees in bringing this action as permitted under 18 U.S.C. § 1836(b)(3)(D) of the Defend Trade Secrets Act and Ohio Rev. Code § 1333.64(C) due to the Defendants' willful and malicious misappropriation of Polaris' confidential and trade secret information, and order them to repay Polaris' damages as a result of the unlawful misappropriation; and

8. Enter judgment in favor of Polaris and against Defendants on all other counts in an amount to be determined at trial and order Defendants to pay damages to Polaris, including, but not limited to, compensatory and punitive damages, costs, Polaris' reasonable attorney's fees, and interest as provided for by contract, statute, and/or common law; and

9. Grant all other relief the Court deems just and proper in the circumstances.

Dated: November 20, 2025.

Respectfully submitted,

**BARNES & THORNBURG LLP**

*/s/ Jason T. Clagg*

Jason T. Clagg, Ohio Atty. No. 97303
Cody D. Woods, Ohio Atty. No. 103642
888 S. Harrison St., Suite 600
Fort Wayne, Indiana 46802
Phone: 260-423-9440
Fax: 260-424-8316
jason.clagg@btlaw.com
cody.woods@btlaw.com

*Counsel for Plaintiff*
*Polaris Home Funding Corp.*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 20, 2025, a copy of the above was electronically filed with the Court and was served via the CM/ECF system to the following counsel of record for Defendants:

Michael P. O'Donnell
Lauri P. Hartmann
FRANTZ WARD LLP
modonnell@frantzward.com
lhartmann@frantzward.com

*/s/ Jason T. Clagg*
Jason T. Clagg